Burke, J. (dissenting).
The majority opinion suggests that we are to determine the question of the power of the Appellate Division, First Department, to promulgate rule 4 in the light of the concession by plaintiffs herein that the rule is reasonable, necessary and serves to advance the status of the profession. This reasoning is derived from a statement in the affidavit of one of the plaintiffs that the necessity and reasonableness of the rule are not in issue on this appeal. This statement is not, in terms, a concession, but was offered, as the affidavit states, solely for the purpose of limiting the issues in the action.
The sole issue before the court now is one of authority. However, since the majority finds it incumbent to defend the reasonableness of the rule, and its necessity, we should look into it with some degree of particularity.
The majority maintains this position despite the conclusions of Mr. Justice Wasservogel, who, in reporting on the hearings held in connection with the rule, found that it was not necessary. Certainly his finding is not without basis in fact. Indeed, we find ample support for his position in the very records of the Appellate Division, First Department, itself. That court, as the preamble to rule 4 duly notes, has been opposed to con *116 tingent fee retainer contracts which provide that the fee shall be 50% of the recovery. As early as 1950 — by the very admission of the Appellate Division, First Department, that court regarded such an agreement unconscionable per se (Buckley v. Surface Transp. Corp., 277 App. Div. 224). Yet in the 10-year period 1949-1958 inclusive, when the number of lawyers practicing in the First Department increased sharply, the number of attorneys subjected to disciplinary action each year averaged but 14 in number. In the preceding 10-year period, the average number of attorneys subjected to disciplinary proceedings was 27.4 each year. Few, if any, attorneys were disbarred, suspended, censured or struck from the rolls because they had provided services in return for contingent fees in excess of 33%% of the amount of recovery.
Comparing the 1949-1958 period with the preceding 10-year period, we find that while the average number of contingent fee retainer contracts filed each year has doubled the average number of attorneys disciplined has been decreased by one half. The ratio is revealing; disciplinary proceedings have decreased in inverse proportion to the increase in the number of retainers filed. Indeed, the number of attorneys disciplined for extracting unconscionable fees have been so few in number that they are included in the records of the Appellate Division, First Department, concerning disciplinary matters under the heading “ Miscellaneous ”.
Surely, we must assume that the First Department was not derelict in its statutorily mandated duty to discipline attorneys whose actions that court regarded as unconscionable or unreasonable. These contingent fee retainer agreements were filed with the Clerk of the First Department; the contracts were readily available for the scrutiny of the court. Under subdivision 2 of section 90 of the Judiciary Law, the Appellate Division need not have waited until a dissatisfied client protested the attorney’s fee. That court admittedly has the power to initiate proceedings, sua sponte, in individual cases where it regarded the fee charged to be unconscionable. Since we must assume that the First Department has discharged its duty to the People of this State as well as to the members of the Bar, we can only conclude that the disciplinary action in this area, infrequent though it might have been, was sufficient to *117 meet the threat imposed by attorneys filing such contingent fee retainers.
To sustain the necessity of the rule, we are told that upwards of 150,000 contingent fee retainers were filed annually during the 10-year period, 1949-1958, and that approximately 60% or 90,000 agreements provide that the fee shall be 50% of the recovery. But the actual fees received by attorneys which may be found in the closing statements required to be filed by the First Department are not disclosed. There are no statistics to show the percentages reserved as attorneys’ fees on actual recoveries. The number of closing statements filed each year is about 50,000. The differential between the number of closing statements and the number of retainers filed annually indicates that in many instances no settlement is reached, no recovery is had, and no fee is retained. One would imagine that, to obtain a true picture of the amount received by attorneys under contingent fee retainers, one should look at these closing statements, which would show actual figures, rather than the retainer agreement itself, which contains little information but does serve to inform the court that a claim has been asserted, and that a particular attorney has agreed to pursue the claim for a stipulated percentage of the recovery, if any.
Hence, an unbiased, objective appraisal of the relevant factors indicates that there is a singular lack of evidence to show the necessity of the rule. Similarly, the reasonableness of the rule is open to question. Attorneys, as everyone else in this country, have been subjected to inflation. But it is argued that plaintiffs’ verdicts have similarly increased and, hence, contingent fees are much too high. The American Bar Association, however, has published studies indicating that compensation for attorneys has not increased correspondingly over these inflationary years as has the remuneration of other professions as medicine and dentistry. Also ignored is the fact that the courts themselves have additionally increased the burgeoning costs of an attorney by requiring him to file innumerable papers to serve the orderly administration of justice.
The rule fails to consider that an attorney, without initial cost to a client, makes available to that client his talents, his office facilities and his secretarial assistance to process the client’s claim. An attorney may not be a partner in the claim, *118 but he assumes a great risk in processing the claim. His money and time, which he has expended, may produce no return.
Rule 4 here fails to take into account, at the very beginning, that the case may be tried and retried, that appeals may be taken, before a judgment may be collected. And in some instances, after all these services have been rendered, there is no money judgment for the plaintiff. These are the hazards which an attorney assumes when he accepts a client on a contingent fee basis. How can a court be so omniscient to state that, at the outset, before the greater part of the work has been done, that a particular percentage is unreasonable under any and all circumstances! Under some circumstances, it is quite conceivable that a contingent retainer fee of 33%% of the recovery may be unreasonable. It may very well be that fees in excess thereof should be the exception rather than the rule. But the reasonableness of the fee — regardless of the percentage chosen — can only be determined in an ad hoc proceeding, after the event.
But the reasonableness of the rule and the necessity of the rule are not in issue here. And rather than base this opinion — as has the majority based its opinion — upon an assumption which is rebutted by all the factual data in the Appellate Division archives, we examine the power to enact the rule not in the light of necessity and reasonableness, but from the history which has culminated in the acceptance of this rule by only one of the four departments of the Appellate Division.
The hearings held immediately prior to the promulgation of rule 4 did not consider the power of the Appellate Division to promulgate the rule, but dealt with its necessity. But other committees, formed on other occasions, have considered this question. Their conclusions that the courts do not have this power to regulate attorneys’ fees, while not conclusive, nor binding upon this court, are certainly persuasive authority, and are entitled to great weight. (Association of Bar of City of New York Reports, Vol. 65, Set D No. 475 [1938 Annual Reports, pp. 295-296]; Vol. 80, No. 649 [1943]; Bronx County Bar Assn. Report in Library, Assn. of Bar of City of New York, fol. n p 1940 in folio pam. v. 245; 31 N. Y. State Bar Assn. Rep. 121 [1908].)
*119 The Association of the Bar of the City of New York, which has before this court so militantly and ably defended the power of the Appellate Division to promulgate this rule, had concluded after investigation, hearings and mature thought not once, but at least twice, that the court’s power to regulate contingent fees was circumscribed by law. In 1938, a special committee of that honored association, in its reports, after discussing the proposition that “ there is little practical scope left for the argument that the courts retain any power in this field apart from fraud and overreaching ” further stated: “ However that may be, the lines of judicial and legislative doctrine are too firm by this time to sustain the hope of successful modification by the judiciary alone. There is definite and unquestioned need for a new deposit of authority in our courts, and this deposit of authority must come from new legislation. ’ ’ (Annual Reports of Association of Bar of City of New York [1938], pp. 295-296.)
And again in 1943, another committee of the Association of the Bar reviewed the problem. And again the committee concluded that the broad scope of section 474 of the Judiciary Law imposed restraints upon judicial regulation of contingent fees. And again the committee suggested remedial legislation: “ We can only point the way in the hope that the legislature, where many of our professional brethren labor, may also recognize the evil and give to the courts the power to apply some remedy.” (Association of Bar of City of New York Reports, Vol. 80, No. 649 [1943].)
This view — that the power to regulate contingent fees is not vested in the courts—is not new. Indeed, as far back as 1908, a committee of the State Bar Association deplored the abuses of the contingent fees by attorneys and recommended that control of such fees be specifically vested in the courts. (31 New York State Bar Assn. Rep. 121.) The Legislature, however, rejected this proposal.
The report is significant in that it clearly demonstrates that under the statutory law of this State which in this area has remained unimpaired since that time — there was a recognition that courts did not have the power to regulate fees. Further, it is also significant since it shows that the Legislature did not think that there were abuses, or that the courts should regulate fees. And this has been the thinking of the Legisla *120 ture, since that time, for they have continually rejected such bills as would vest power in the courts to regulate contingent fees (see, e.g., N. Y. Senate Bill, Sen. Int. No. 419, Print No. 457, 1941 Sess.).
Special Term and the unanimous Appellate Division, Third Department, have similarly found rule 4 to regulate fees, and have similarly concluded that the Appellate Division, First Department, lacked the power to enact such a rule.
The majority opinion states: “ The Appellate Division, Third Department, and Special Term have both started with the assumption that rule 4 threatens disciplinary action against lawyers who make retainer agreements with clients that would otherwise be valid and enforcible under section 474 of the Judiciary Law. It follows from this false premise that the effect of rule 4 is to regulate fees of attorneys differently from the way in which they are regulated by statute. We find no basis for this assumption in the language of the rule, in its preamble, or in the evil which it proposes to remedy. The rule does not touch lawyers’ fees except such as would be unenforcible in any event under section 474 of the Judiciary Law.”
The false premise to which the majority refers is not the threatened disciplinary action, for rule 4 obviously exposes any attorney charging, without court permission, a contingent fee in excess of the schedule set forth to disciplinary action. The false premise, according to the majority opinion, upon which the courts below rested their decisions, is that rule 4 prohibits contracts which are enforcible under section 474 of the Judiciary Law, which states that “ [t]he compensation of an attorney * * * for his services is governed by agreement, express or implied, which is not restrained by law ”. The majority says that this assumption is not true. Or rather, it assumes that there is no basis for this assumption. The rule proscribes fees in excess of 33%% of the amount of recovery. Yet there are cases in this court, of which the majority is aware because it has cited them continually to sustain its position, where this court has sustained a 50% contingent fee! (Ward v. Orsini, 243 N. Y. 123; Morehouse v. Brooklyn Heights R. R. Co., 185 N. Y. 520; Matter of Fitzsimons, 174 N. Y. 15, 23-25.)
The only basis upon which the majority can sustain its decision is this: “ If the rule is limited, as we interpret it, to making *121 provision for disciplining attorneys for receiving more from their clients than could legally be collected under retainer agreements even with the aid of section 474 of the Judiciary Law, the judgment appealed from is without foundation.”
This belated attempt to harmonize rule 4 with section 474 of the Judiciary Law does not survive analysis. As we have shown, the cases indicate that a 50% contingent fee may be enforced under section 474 of the Judiciary Law; it may not be enforced under the present rule 4, unless prior approval of the First Department is obtained. A court cannot predict a priori the reasonableness of a fee to be charged in the event of recovery, where there has been no recovery and, indeed, where there has been little work done in processing the claim.
We cannot conclude that the rule describes as censurable conduct that which has always been censurable. If it has been previously clear that contingent fees in excess of the recommended schedules were censurable, there would hardly be need for the Appellate Division to hold extensive hearings and promulgate a merely repetitive rule. Further, the premises that the rule proscribes conduct by attorneys which has always been censurable is belied by the fact that only in rare instances has the First Department censured attorneys for such conduct.
There is another evil inherent in this type of rule. The power to promulgate the rule necessarily implies the power to amend the rule. Admittedly, the Appellate Division, First Department, totally lacks the power to promulgate a rule which states that any percentage agreement would be unreasonable, since this would clearly controvene section 474 of the Judiciary Law — even if attorneys were granted the privilege to have their compensation fixed by a court upon proper application. While it does not seem likely that the First Department would test the extent of its power to that extreme, it can conceivably lower its present recommended schedule of fees to such a lower percentage that it would not be economically feasible for attorneys to enter into such contingent fee contracts. The other equally unpalatable alternative for attorneys would then be to contract for fees in excess of the prescribed rates and face the certainty of disciplinary action.
The innate mischief of the rule, and the conclusion that it does, in fact, fix fees, is apparent when the rule is carried *122 to its logical extremes. Why, for instance, is a contingent fee of 33%% of the recovery fair and conscionable under all the circumstances, but a contingent fee of 34% unfair and unconscionable under all the circumstances? The reasonableness of the fee is not determined solely on the amount charged, but also by the quality of the services rendered in light of the circumstances of the particular case. (Ward v. Orsini, 243 N. Y. 123, supra; Matter of Friedman, 136 App. Div. 750, affd. 199 N. Y. 537; Morehouse v. Brooklyn Heights R. R. Co., 185 N. Y. 520, supra; Matter of Fitzsimons, 174 N. Y. 15, supra; Barry v. Whitney, 3 Sandf. 696.)
Since then the premise that rule 4 prohibits contracts which would be enforcible under section 474 of the Judiciary Law is correct, as I have attempted to indicate, it follows that rule 4 in effect fixes contingent fees. To conclude otherwise, from reading the rule, would be sheer sophistry.
Eule 4, as we have shown, conflicts with section 474 of the Judiciary Law. From this statement, several corollaries may be derived. The first is that the Appellate Division, First Department, may not promulgate a special rule in contravention of a specific statute even under the grant of power under section 83 of the Judiciary Law. (Chase Watch Corp. v. Heins, 284 N. Y. 129; Moot v. Moot, 214 N. Y. 204; Ackerman v. Ackerman, 123 App. Div. 750, affd. 200 N. Y. 72; Glenney v. Stedwell, 64 N. Y. 120.) Another corollary is that, in usurping power not granted to it by the Legislature, the court has enacted legislation contrary to the method prescribed by the State Constitution.
Further, the rule changes the substantive law of the State for one particular group of lawyers practicing in one particular area of the State. In Matter of Mayor of City of New York (19 Barb. 588) local rules of the General Term of the Supreme Court in the First Judicial District, permitting the court to fix attorneys’ fees in street opening proceedings, were held to be void. The court said (pp. 491-492) that the rules, if legal, “ are general rules applicable to all cases of like character. Therefore, the general term in a district had no legal power to make them; for which reason, those rules are void and nugatory.”
Eule 4 suffers from the same infirmity. If legal, it should be applicable to all cases of like character, not only to cases *123 where the attorney has his office in the First Department, or to cases which are tried in the First Department. Hence, the Appellate Division, First Department, has no power under section 83 of the Judiciary Law to promulgate this “ special rule ”. Hence, lawyers in one part of the State may seek enforcement of a contingent fee retainer in the courts of law but, in the First Department, an action may not be brought if the compensation provided for in the agreement exceeds the limits provided for in rule 4. Such discrimination between citizens of the State with regard to their access to our courts is a violation of the due process and equal protection clauses of the State and Federal Constitutions. (See Gregonis v. Philadelphia & Reading Coal & Iron Co., 235 N. Y. 152,159.)
The judgment appealed from should be affirmed, without costs.